## In re SAVARINO.

District Court, S. D. New York.
Oct. 5, 1932.

Fogarty, Quel & Devlin, of New York City (Seymour B. Quel, of New York City, of counsel), for the petition.

George Z. Medalie, U. S. Atty., of New York City (L. M. Treadwell, Asst. U. S. Atty., of New York City, of counsel), opposed.

WOOLSEY, District Judge.

This petition is in all respects denied.

I. The petitioner herein seeks to have turned over to him the sum of $500 in bills found on April 2, 1931, in a taxicab of which he was the driver, and the Parmalee Transportation Company, commonly referred to as the Yellow Taxicab Company, was the owner.

The money in question was taken from the taxicab by Special Agent Harris, of the Bureau of Investigation of the United States Department of Justice, under circumstances which will be hereinafter discussed, as it was discharging its fares at Forty-First street and Lexington avenue outside the office building at 370 Lexington avenue, wherein the New York City office of the Bureau of Investigation of the Department of Justice is housed.

Thereafter this money was marked in evidence by the government as an exhibit in the case of United States v. Richard Nash and Philip De Stefano (D. C.) 51 F.(2d) 253, which, after trial before me from June 2 to June 15, 1931, resulted in the conviction of both defendants, and has since been affirmed on appeal. Nash et al. v. United States, 54 F.(2d) 1006 (C. C. A. 2).

II. On the question of my jurisdiction summarily to deal with this petition, counsel for the petitioner cites Go-Bart Importing Co. v. United States, 282 U. S. 344, 355, 51 S. Ct. 153, 75 L. Ed. 374; Goodman v. Lane, 48 F.(2d) 32, 35 (C. C. A. 8); United States v. Kelly (D. C.) 51 F.(2d) 263.

Whilst the Goodman Case did not involve a summary proceeding but dealt with a bill in equity, the court recognized, 48 F.(2d) at page 35, the diverse methods, including summary proceedings, which may be used (1) to secure property taken or retained without justification by prosecuting officers or agents of the United States; or (2) to prevent the use of such property as evidence against the persons from whom it was taken.

The present application differs from any other which has come to my attention, however, because the petitioner here does not seek to prevent the use of the $500, above referred to, as evidence, but, after it has been so used, asks to have it turned over to him on the ground that he is entitled to the status of a finder thereof, and so has a good title against all the world except its true owner, who concededly has not made claim to it.

The United States attorney does not challenge my summary jurisdiction herein. I assume, therefore, that he, or some one over whom he is in a position to exercise control, now has possession of the money sought by the petitioner.

Accordingly, I feel that under the authorities cited I am justified in dealing with this summary proceeding on its merits.

III. By agreement of counsel the record in the case of United States v. Richard Nash and Philip De Stefano, above mentioned, is before me on this application.

Consequently I am in a position somewhat different to that in which a judge usually finds himself on an application based on affidavits, for the witnesses whose testimony is relevant on the issue I have to decide here—namely, whether the petitioner found the $500—all testified before me. The episode of the finding of the money in the taxicab was so unusual that it made a deep impression on me at the time, and on again reading the evidence in the record of the participants therein I find myself thoroughly refreshed as to their appearance on the stand and consequently as to their credibility.

IV. Summarized sufficiently for present purposes, the story told of the finding of

the money which the petitioner now claims is as follows:

For some time prior to April 2, 1931, Nash, a narcotic agent, had been under suspicion in connection with an attempt to bribe another narcotic agent, Lachenauer, to induce him to fail to identify and arrest one Peter Ellinois, who was under indictment in this court charged with a conspiracy to violate the narcotic laws of the United States and whom the narcotic officers had been unable to find.

On April 2, 1931, having been advised by Lachenauer that Nash had on that day in a restaurant at 449 Pearl street, New York City, given him $1,000 for the purpose aforesaid, and that he, Nash, De Stefano, and Keane, a narcotic agent, who was later indicted with Nash and De Stefano and acquitted on the trial in which they were convicted, would be at 62 West Fifty-Second street, New York City, that evening, the Bureau of Investigation office here sent Special Agent in Charge Connelley, Special Agents Harris, Carney, and Fitzpatrick, and Special Agent Igoe of the United States Narcotic Service, to the neighborhood of 62 West Fifty-Second street to try to pick up Nash, De Stefano, and Keane. These men remained for some hours in the vicinity of the address given, and about midnight Nash and Keane, accompanied by Lachenauer, were seen to come out. Special Agent Igoe, their superior officer in the Narcotic Service, thereupon requested them to accompany Special Agents Harris and Fitzpatrick to the headquarters of the Bureau of Investigation of the Department of Justice.

A Yellow taxicab, of which the present petitioner was the driver, stood nearby, and the officers engaged it to take them with Nash and Keane to headquarters. Within the taxicab the group seated themselves thus: Keane was on the right-hand side of the back seat, with Fitzpatrick on the left-hand side thereof with Nash, facing forward, in his lap. Harris sat on the right-hand collapsible seat facing towards the back of the cab so he could watch Nash and Keane.

Savarino, the present petitioner, who was driving the cab, sat on the driver's seat, which was outside and directly in front of the left-hand collapsible seat. That seat was at first unoccupied, but, after Nash had complained several times that he was in a cramped and uncomfortable position, and when the taxicab had gone about halfway to its destination at the Bureau of Investi-gation headquarters, Nash was permitted to turn down the left-hand collapsible seat and occupy it. He then sat facing forward, directly behind the driver, Savarino.

Both Nash and Keane had been told to keep their hands out of their pockets, and as long as Nash sat in Fitzpatrick's lap the latter had hold of his arms to insure obedience to this order; but, so soon as Nash was allowed to sit in the collapsible seat, he was seen to put his left hand in his left-hand overcoat pocket. He was told to remove his hand and did so. About the time that the taxicab was turning from Madison avenue into Forty-First street, Special Agent Harris observed Nash drop something to the floor of the taxicab immediately in front of him. As the only light in the cab was such as was given by the street lamps which it was passing, Harris was unable to see what had been dropped. But as the end of the drive was near he noted the incident and bided his time.

When the taxicab reached its destination at the corner of Lexington avenue and Forty-First street, it had its right wheels to the curb, and, as was natural, Harris, the occupant of the right-hand collapsible seat opened the door and got out backwards. On his opening the door the interior light in the taxicab was automatically switched on, and Fitzpatrick observed a roll of bills lying on the floor under the seat where Nash had been sitting.

Keane got out next, and, after he stepped out, Agent Fitzpatrick told Nash to pick up the money. Nash refused to do so, denying that it was his money. An argument ensued which undoubtedly was overheard by Savarino, and finally Harris told Nash to get out of the cab. He did so, and was followed by Fitzpatrick. Then Harris reached in, picked up the roll of bills from where it lay under the seat Nash had been occupying, and, after showing Fitzpatrick what he was doing, put the money in his own overcoat pocket.

Those are the relevant facts as I find them, and on those facts I hold that Agent Fitzpatrick found the money.

I do not believe now and I did not believe on the trial, the version of the disembarkation from the cab given by the petitioner. He claims that he tried to open the door from his seat, and that his hand and Harris' hand almost touched when he did so, and that as soon as the door was opened he saw the money "lying right in front of me." This is obviously impossible, unless all the

stories of the other witnesses are to be disbelieved, for Nash would naturally not throw the money towards Harris' side of the car, and, if he did, the collapsible seat which Harris was occupying would have prevented Savarino, from the driver's seat, from seeing the money on the floor under Harris' seat. It should be noted that the collapsible seats in the taxicab were not of the type in which the occupants using them normally faces backwards and which fly up when the occupant gets out, but were what Savarino described, in answers to questions put by me at the trial, as the "Pullman" type of seats which enable the occupants to sit facing forwards.

Furthermore, when the altercation about the money arose after Harris got out, Nash was sitting facing forward in the left-hand seat and the money was under his seat. Consequently Savarino could not have seen the money when the door opened, if, indeed, he ever saw it.

The whole foundation of Savarino's claim as finder of the money can only be based, therefore, not on his finding it himself, but on learning, what is common ground here, that it was found in the taxicab which he was driving. Indeed that seems to be the gravamen of his petition, for he says on page 3 thereof: "None of the occupants of the car claimed the money as theirs, and according to law, in the absence of the lawful owner, the money having been found in your petitioner's cab, it properly belongs to him."

■ V. Unfortunately for the petitioner, however, the law is not as he states it. Ever since 1735, when the case of Armory v. Delamirie, 1 Strange, 505, involving the chimney sweeper's boy who found a jewel in a chimney and was cheated by an avaricious goldsmith, was decided by Lord Chief Justice Pratt, the law has been settled that the finder of a chattel becomes what may, perhaps, be aptly called a fortuitous bailee thereof with such a property therein as enables him to keep it against all the world except its rightful owner, and to defend it against all others with every remedy which is available to a bailee.

■ But it is only the actual finder of a lost chattel who thus achieves a bailee's status; the owner of the place or vehicle wherein it was found does not.

In Bridges v. Hawkesworth, 7 Eng. Law & Equity Rep. 424, the plaintiff picked up from the floor of the defendant's shop a parcel containing £65 in bank notes. He turned them over to the defendant shopkeeper in order that the latter might advertise for the rightful owner. After three years had elapsed, and though due advertisement had been made, no one appeared to claim the notes, the plaintiff demanded their return to him by the defendant, tendering the cost of the advertisement and an indemnity. The defendant refused to return the notes, and the plaintiff brought trover against him. The defendant had judgment in the county court, but, on appeal, this judgment was reversed by Paterson and Wightman, JJ., who held that one who finds a lost chattel on another's premises has a right to it superior to that of the owner of the premises on which it was found, and that, if the latter withholds it, the finder may maintain trover against him because the finder's title is good against all the world except the rightful owner. Cf. also Miller v. Race, 1 Burrows, 452.

When, as in the cases above mentioned, the owner of the place wherein a lost chattel is found is not in the relation of employer to the finder, or where the parties are at arm's length as in the case of the buyer of an old safe who found money therein not known of by either party to the sale, Durfee v. Jones, 11 R. I. 588, 23 Am. Rep. 528, there is little difficulty in acquiescing in the principle just discussed.

But the doctrine of the finder's status is so strictly enforced that, even when an employee finds a lost chattel on his employer's premises, he is held entitled thereto as against his employer if the latter be not the true owner thereof. Bowen et al. v. Sullivan, 62 Ind. 281, 30 Am. Rep. 172, Tatum v. Sharpless, 6 Phila. (Pa.) 18, and semble Mathews and wife v. Harsell, 1 E. D. Smith (N. Y.) 393.

■ Indeed the authorities may be summarized as holding that the bailee status of the finder of a chattel is not affected by the character of the thing found, by the place or vehicle in which it is found, or by the relation of the finder to the owner of that place or vehicle.

■ VI. It will be seen, therefore, from the authorities just considered, that the legal result of the fact that the $500 was found in the taxicab which the petitioner was driving did not in and of itself give either to the petitioner himself, as bailee of the taxicab, or to his employer, the Parmalee Transportation Company, as owner thereof, any right to claim a finder's status with regard thereto.

I decide, therefore, that, as the money which the petitioner seeks herein to recover was found by Special Agent Fitzpatrick and reduced to possession by Special Agent Harris, the petition must fail.

An order dismissing the petition without costs may be presented for signature on the usual notice.